FILED
DISTRICT COURT OF GUAM
MAR 29 2006
MARY L.M. MORAN
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JUSTIN KEITH GUERRERO and<br>RENEA DORLEEN CRUZ-TAITANO,<br><br>Defendants. | MAGISTRATE CASE NO. 05-00045<br><br>**ORDER**<br>re Motions to Suppress |

This matter is before the Court on two (2) motions to suppress evidence and statements, filed by the Defendants Justin Guerrero ("Guerrero") and Renea Cruz-Taitano ("Cruz-Taitano"). Upon due consideration of the parties' argument and review of the testimony adduced at the evidentiary hearings,[1] the Court hereby issues the following Order.

**PROCEDURAL BACKGROUND**

On September 9, 2005, an Information was filed charging the Defendants with the possession of approximately one (1) gram of methamphetamine hydrochloride, in violation of 21 U.S.C. § 844(a). (Docket No. 1.) The offense is a Class A misdemeanor.

---

[1] Although this Court heard days of testimony and evidence in relation to other motions to suppress stemming from this same investigation (see United States v. Mesa, et al., Criminal Case No. 05-00066), the Court limits its factual findings and conclusions herein to the testimony and evidence presented during the hearings held on January 5, 6, 9, and 11-13, 2006.

On October 14, 2005, the Defendants each filed a motion to suppress the physical evidence obtained and all statements made by them following their detention and arrest on September 8, 2005. (Docket Nos. 20 and 21.)

On November 18, 2005, pursuant to 18 U.S.C. § 3401(b), Cruz-Taitano consented to the trial, judgment and sentencing before the below-signed Magistrate Judge. (Docket No. 33.) On November 28, 2005, Guerrero likewise consented. (Docket No. 37.)

The Court held hearings on the suppression motions on January 5, 6, 9, and 11-13, 2006. Thereafter, the Court took the matter under advisement.

## FINDINGS OF FACT[2]

On September 8, 2005, Danny Cho ("Cho"), a criminal investigator with the Drug Enforcement Administration ("DEA"), applied for and obtained a search warrant for Room 755 at the Guam Reef Hotel in Tumon, Guam. The search warrant application was based in part on information Cho received from an anonymous caller who reported that four (4) individuals – Jess Espinosa, Joey Mesa, Ginger Hamamoto, and Shardae Love ("Love") – were engaged in the manufacturing of methamphetamine at the hotel. The search warrant application also included information Cho gathered as a result of his further investigation into the matter. For instance, Cho passed the information received from the anonymous caller to the Violent Street Crimes intelligence unit of the Guam Police Department ("GPD"), and GPD subsequently advised Cho that it had a booking photo of Love, who had been arrested in August 2005 for unknown charges. Following a visit to the Guam Reef Hotel, Cho learned from the hotel management staff that Love was staying at the hotel with some male friends and had changed rooms every day of their three-day stay at the hotel. Cho also personally observed Love enter the lobby of the hotel carrying combustible fuel and water in two shopping bags. Cho questioned Love who provided conflicting statements about her purpose for bringing combustible fuel to the hotel. A search warrant for Room 755 was thereafter issued by Judge

---

[2] To the extent that a finding of fact should be deemed a conclusion of law, or a conclusion of law deemed a finding of fact, it shall so be considered and incorporated.

Otero at approximately 8:45 p.m. that day.

With the warrant in hand, Cho proceeded to a predetermined briefing site located at the parking lot across from the Okura Hotel in Tumon. There Cho briefed the other law enforcement personnel who would be assisting in the execution of the search warrant. Among said personnel was Barbara Tayama ("Tayama"), a female officer with Guam Customs & Quarantine who had been tasked to the U.S. Immigration & Customs Enforcement ("ICE") division. Tayama's assignment that day was to assist with the processing or interviewing of any female individual associated with Cho's investigation into unlawful drug activity occurring at the Guam Reef Hotel. Cho explained that a search warrant had been issued. He discussed the nature of the investigation, and stated that because there was possibly a methamphetamine laboratory in operation in the room, all officers should remain alert and aware. This briefing by Cho lasted approximately 10 to 15 minutes.

Cho and the others then left the briefing site for the Guam Reef Hotel. At the hotel, Cho met briefly with the hotel security manager, while Love, Tayama and the other officers gathered at the seating area in the first floor lobby near the front desk. Tayama then saw a "young local couple" later identified as the Defendants enter the hotel and walk into the lobby area. The Defendants walked toward the elevators on the right, which led to rooms in the hotel wing opposite from where Room 755 was located. Tayama noticed that when the Defendants entered the hotel, Love appeared nervous. Tayama testified that she observed Love slide down on the chair in which she was seated and then attempt to cover her face with her jacket, appearing as if she did not want the Defendants to see her. Tayama then asked Love if she knew the couple, but Love denied knowing them.

John Duenas ("Duenas"), a criminal investigator with ICE, was also near Love in the lobby area, and he, too, observed the Defendants walk into the lobby and then noticed that Love dropped her head and looked the other way in an attempt to hide her face. Duenas and Tayama then briefly discussed their observations of Love's reaction to the Defendants.

Shortly thereafter – approximately two (2) to three (3) minutes after having observed the Defendants in the hotel lobby, according to Tayama – Love was escorted to the seventh floor of

the hotel by Cho and the other officers. Love had previously agreed to assist Cho by knocking on the door of Room 755 so that the occupants therein would open the door upon seeing her through the peep hole. Tayama testified that Love appeared quiet and nervous when they arrived on the seventh floor. After the door was opened and the entry team went into Room 755, Tayama quickly escorted Love away from Room 755 and had her sit by the seating area near the elevators. Tayama, Duenas, and the other officers who were not part of the entry team waited in the seventh floor lobby area by the elevators for further instructions from Cho.

Not long thereafter,[3] Tayama again spotted the Defendants as they exited the elevator on the seventh floor.[4] Tayama noticed that Love again tried to hide her face with her jacket, which Tayama interpreted as Love trying to avoid eye contact with the Defendants. Based on Love's reaction, Tayama asked a fellow male officer to watch Love and then quickly approached Cruz-Taitano in front of the elevators. Simultaneously, Erwin Fejeran ("Fejeran"), a task force agent assigned to ICE, intercepted Guerrero at the elevators as he exited. Duenas followed Fejeran to assist since neither were part of the entry team. Tayama identified herself and explained that there was an on-going investigation at the hotel. Tayama then instructed Cruz-Taitano to follow her and proceeded to "escort" or "guide"[5] Cruz-Taitano down the hallway to the right of the elevators and away from Room 755, while Fejeran asked Guerrero to step aside to the area in front of what is marked as elevator "2" in Exhibit A.

///

///

---

[3] Tayama approximates this period as being one minute from the time Love was first taken to the seating area on the seventh floor.

[4] According to Tayama, the time between her initial sighting of the Defendants in the first floor lobby and her second observation of them as they exited the elevators on the seventh floor was approximately 10 to 15 minutes.

[5] When asked to explain what Tayama meant when she said that she had "escorted" or "guided" Cruz-Taitano away from the elevator area, Tayama demonstrated that she placed her right hand on Cruz-Taitano's left elbow and then led her down the hallway to the right of the elevators. Tayama denies grabbing Cruz-Taitano out of the elevator or pulling her down the hallway.

Tayama took Cruz-Taitano approximately 30 feet[6] from the elevators down the hallway to the right. Tayama testified that she led Cruz-Taitano to this area because of concerns that Cruz-Taitano could be exposed to fumes or chemical odors that may emanate from Room 755 and because there was too much distraction by the elevator area based on the activities associated with the search warrant execution. Tayama asked Cruz-Taitano for her name and identification. Cruz-Taitano stated her name and produced her Guam Identification Card as requested. Tayama then asked Cruz-Taitano what she was doing at the hotel, to which she responded that she was there with her boyfriend Justin to visit his friend. When Tayama asked what this friend's name was, Cruz-Taitano said his name was "Joe" and she wasn't sure of his last name but it could be "Mesa." Tayama asked whether Cruz-Taitano had any weapons, knives, sharp objects, drugs or paraphernalia on her person,[7] to which Cruz-Taitano responded "no." Tayama did not conduct a pat down of Cruz-Taitano at this time. Tayama then told Cruz-Taitano to wait there with her until things calmed down at the other end of the hallway (referring to the activity occurring near Room 755). Tayama waited for further instructions from Cho, the lead agent, as to what she should do with Cruz-Taitano. Tayama never told Cruz-Taitano that she was free to leave at any time. In fact, Tayama testified that if Cruz-Taitano attempted to leave, Tayama would have detained her. Cruz-Taitano also testified that she did not believe she was free to leave at this time.

Meanwhile, Fejeran questioned Guerrero in the area by the elevators. Fejeran asked Guerrero what he was doing at the hotel, and Guerrero replied that he was there to visit his friend "Joe." Fejeran asked for Joe's last name, but Guerrero said he didn't know the last name.

---

[6] During cross-examination, defense counsel Curtis Van de veld asked Tayama how far down the hallway did she take Cruz-Taitano. Tayama stated that she wasn't sure of the exact distance but believed that it was the distance from the witness stand to the swing doors that lead into the well of the courtroom. Attorney Van de veld estimated this distance to be about "30 yards" but a subsequent measurement by the court staff revealed this distance to actually be 30 feet.

[7] Tayama testified that the purpose of asking this question was for her safety and the safety of Cruz-Taitano.

Fejeran asked Guerrero where he was headed, and Guerrero said "Room 756." Duenas then informed Guerrero that they were currently conducting a narcotics investigation at the hotel. Guerrero then became irate and stated that he had nothing to do with narcotics. Duenas then asked Guerrero to show them where his friend Joe was, and Guerrero proceeded down the hallway to the left of the elevators, with Duenas and Fejeran following beside him. Said hallway was where Room 755 was located. Guerrero walked past Room 755 and stopped in front of the door to Room 754. Duenas told Guerrero to knock and ask for Joe, but Guerrero refused. Then Duenas told Guerrero that earlier Guerrero stated that he was there to visit Joe in Room 756, yet Guerrero had taken them to Room 754.[8] Guerrero again appeared upset and repeated that he was not involved in any narcotics activity. Guerrero was then taken back to the seating area near the elevators, where Duenas asked to see his identification and also conducted a pat down of Guerrero. Guerrero was then placed in one of the chairs in the seating area where Love was still seated.

After some time had passed – which Tayama approximates as being about 20 minutes – Tayama learned that items associated with a methamphetamine laboratory were discovered in Room 755 and was instructed by Cho to transport Cruz-Taitano to DEA's Guam Resident Office for further questioning. Tayama then spoke to Cruz-Taitano and advised her that for "officer safety" Tayama would have to pat down Cruz-Taitano. Tayama explained the manner in which the pat down would be conducted. Tayama testified that she then gave Cruz-Taitano "a second opportunity" to declare whether Cruz-Taitano had any weapons, knives, sharp objects, drugs or paraphernalia on her person before the pat down could be conducted. To this remark, Cruz-Taitano then responded that she had "something." Tayama testified that she asked what was the something to which Cruz-Taitano was referring. Cruz-Taitano then pointed to the black bag she was wearing and said she believed it was a pipe. Cruz-Taitano then

///

---

[8] Room 756 was actually located in the hallway to the right of the elevators – opposite from where Guerrero had led Duenas and Fejeran.

unzipped her bag, opened a smaller pouch[9] within the bag, and showed Tayama what appeared to be a glass pipe contained therein. Tayama testified that although the glass pipe was covered in clear plastic wrapping, she could distinctly see that it was a pipe.[10] Next, Tayama asked Cruz-Taitano to remove the bag and hand it to over to her. Tayama then asked a fellow officer (Raymond Taimanglo) to hold the bag while she proceeded to pat down Cruz-Taitano. According to Tayama, Taimanglo never left her side as she conducted a pat down of Cruz-Taitano. Tayama testified that except for a momentary period when Cruz-Taitano had turned around during the pat down, the bag never left Cruz-Taitano's sight while at the hotel. Tayama testified that neither she nor Taimanglo opened Cruz-Taitano's bag at the hotel. Instead, later that night, Tayama had the opportunity to inventory the contents of Cruz-Taitano's bag at the DEA office, and it was during this inventory search that Tayama discovered two plastic straws containing suspected "ice" inside the smaller fabric pouch which held the pipe.

Tayama's testimony regarding the discovery of the straws of "ice" is in direct conflict with Duenas's testimony. According to Duenas, Tayama told him that a pipe and straws of "ice" were obtained from Cruz-Taitano before the officers left the hotel and transported the Defendants to the DEA Resident Office. Based on Duenas's testimony, the discovery of the straws of suspected "ice" had to have resulted from a search at the hotel of the fabric pouch within Cruz-Taitano's bag.

Tayama's testimony differs from Cruz-Taitano's testimony. According to Cruz-Taitano, during the 20-minute wait at the right hallway area, she did not have any contact with Guerrero because Tayama instructed her not to look toward the hallway which led to where Guerrero was being detained. Cruz-Taitano was sitting on the floor while she waited, and then Tayama instructed her to stand. Cruz-Taitano again tried to look down the hallway for Guerrero, but

---

[9] Tayama described this pouch as being a black fabric sunglass pouch.

[10] Tayama testified that Government Exhibit 1 poorly depicts the contents of Cruz-Taitano's bag and the glass pipe that was shown to her, because one cannot clearly tell by looking at the photograph that the white-colored object in the center of the photograph is the glass pipe.

Page 7 of 16

Tayama told her to face the wall. Before Tayama patted her down, Tayama asked Cruz-Taitano again if she had any drugs, weapons, knives or sharp objects, and she replied "something." Tayama asked her what that something was, and Cruz-Taitano said "a pipe." Cruz-Taitano then stated that she unzipped her bag. Tayama then asked Cruz-Taitano to hand the bag over to her. Cruz-Taitano removed the bag from around her shoulder and handed it to Tayama. Cruz-Taitano testified that she did not show the pipe to Tayama and that when she handed the bag to Tayama, the drawstring to the pouch containing the pipe was still closed. Tayama then gave the bag to another officer (Taimanglo) while Tayama conducted the pat down. Cruz-Taitano testified that Taimanglo walked away with the bag while she was being patted down by Tayama. Approximately ten minutes later, Taimanglo returned with the bag. Cruz-Taitano further stated that she never gave anyone permission to search her bag.

Based on Cho's instructions, Tayama and Duenas transported the Defendants to the DEA headquarters for processing and further questioning. The Defendants were handcuffed and brought to the DEA office in separate vehicles. The Defendants were later advised of their Miranda rights and interrogated. Both Defendants subsequently made oral and written admissions.

## CONCLUSIONS OF LAW

The Defendants assert that the officers first violated their Fourth Amendment rights when the officers initially stopped them as they exited the elevators on the seventh floor and then separated them from each other. The Defendants contend that from this point they were unlawfully seized and essentially arrested without justification or probable cause. The Defendants claim they were not free to leave based on the overwhelming presence of many law enforcement officers in the hallway area, the officers' authoritative demeanor and actions, and the fact that the Defendants were not permitted to see or speak with each other.

The Fourth Amendment prohibits unreasonable searches and seizures by the Government. The Supreme Court imposes a presumptive warrant requirement for searches and seizures, and generally requires probable cause for a warrantless search or seizure to be reasonable. See Ornelas v. United States, 517 U.S. 690, 693 (1996) ("warrantless search of car

is valid if based on probable cause"); United States v. Watson, 423 U.S. 411 (1976) (warrantless arrests based on probable cause are reasonable under the Fourth Amendment). However, an exception to the probable cause requirement is recognized for an investigatory detention – often referred to as a Terry stop – wherein police may temporarily detain an individual, question him briefly, and perform a limited pat-down frisk for weapons based upon reasonable suspicion. See Terry v. Ohio, 392 U.S. 1, 22-24 (1968). Reasonable suspicion has been defined to mean a combination of "specific and articulabe facts which, if taken together with rational inferences from those facts" reasonably suggest that criminal activity has occurred or is about to occur. Id. at 21. A case-by-case analysis is required to determine whether the police had reasonable suspicion, and courts look to the "totality of the circumstances" which surrounded the encounter. United States v. Cortez, 449 U.S. 411, 417 (1981).

The inquiry for the Court then is whether the officers had reasonable suspicion at this point in the investigation to temporarily detain the Defendants. The Court must determine what specific and articulable facts did the officers have at this initial stage (*i.e.*, the approach at the elevator, Tayama's escorting of Cruz-Taitano to the right hallway area, and the detention of Guerrero by elevator 2) to reasonably suggest that the Defendants were involved in criminal activity or were about to engage in criminal activity.

The law enforcement officers – Tayama, Duenas and Fejeran included – had been briefed prior to executing the search warrant that an anonymous caller had implicated Love and three other individuals in the manufacturing of methamphetamine at the Guam Reef Hotel. Additionally, they were aware that the hotel management had stated that Love and her companions had been staying in the hotel for the past three days and had changed rooms each day of their stay. Moreover, the officers were advised that when Love was detained earlier at the hotel, she had in her possession a gallon of water and a container of combustible fuel – two key ingredients used to manufacture methamphetamine. Based on the information received during the briefing, the officers knew that there was a strong possibility that evidence of methamphetamine manufacturing would be found in Room 755.

In addition to the information received at the briefing, Tayama and Duenas both saw

Love's reaction to the Defendants' entrance into the hotel lobby. Tayama testified that Love appeared nervous upon seeing the Defendants, and then Love slid down in her seat and attempted to cover her face with her jacket. Duenas stated that Love dropped her head and looked away. Both Tayama and Duenas described Love's response as an attempt by Love to prevent the Defendants from seeing her. Tayama again noticed a similar reaction from Love when the Defendants exited the elevators on the seventh floor.

The Defendants claim that Love's alleged reaction to their presence is insufficient to sustain a finding of reasonable suspicion. The Defendants contend that it is common for individuals who have been arrested or detained by the police to act nervous. Furthermore, arrestees or detainees often attempt to shield their faces from the public because of a sense of shame or embarrassment. Thus, the Defendants assert that the reaction by Love as observed by Tayama and Duenas was not a direct response to the Defendants' presence; rather, Love's reaction was a result of the fact that she was being detained by the police in a public place. While the Court agrees that this argument has merit, the Court is mindful that considerable deference is often given to the observations and conclusions of an experienced officer since he or she can infer criminal activity from conduct that would otherwise seem innocuous to an untrained, lay observer. See United States v. Santamaria-Hernandez, 968 F.2d 980, 984 (9th Cir. 1992) (experienced border patrol agent had reasonable suspicion to stop vehicle based on facts presented); Guam v. Ichiyasu, 838 F.2d 353, 356 (9th Cir. 1988) (reasonable suspicion to stop taxi when officer had knowledge of expected escape route and taxi passenger's otherwise innocent appearance was "out of place"); United States v. Bautista, 684 F.2d 1286 (9th Cir. 1982) (reasonable suspicion to stop men three blocks from getaway car when it had been raining and men appeared dry).

When the Defendants exited from the elevator on the seventh floor, did law enforcement officials have reasonable suspicion to detain them? The government argues that reasonable suspicion existed because (1) Tayama observed Love slide down from her seat when the Defendants entered the Guam Reef Hotel lobby and Duenas observed Love turn her head sideways (both reactions in an attempt to avoid being seen by the Defendants) and (2) the

Defendants[11] were present at the seventh floor, right next to Room 755, the suspected locations where a methamphetamine lab was believed to be in operation. Their presence came shortly after the execution of the search warrant upon Room 755.

The Court must determine whether "reasonable" suspicion existed from the totality of the circumstances at this point in time to justify the Defendants' detention. The Court must thus ascertain what specific and articulable facts the officers had at this initial stage. Reasonable suspicion must be based upon particularized facts. Here, the Defendants first appeared in the lobby area of the hotel approximately ten to fifteen minutes before they were again seen and detained at the seventh floor. When the Defendants entered the lobby area, Tayama and Duenas both observed Love react in a manner they concluded was for the purpose of avoiding being seen by the Defendants. Tayama said Love slid down on her seat while Duenas said she turned her head. Later, the Defendants were seen exiting the elevator on the seventh floor, which is located right next to Room 755, the location of the presumed meth lab. Tayama testified that she again saw a similar reaction from Love when the Defendants exited the elevator on the seventh floor.

In determining whether reasonable suspicion existed from the aforesaid circumstances at this point in time, the Court must focus its inquiry on the circumstances which required the presence of the law enforcement officials at the Guam Reef Hotel, and in particular to Room 755.

Acting on a tip that *Shardae Love, Jess Espinosa, Ginger Perez Hamamoto and Joey Mesa were engaged in the manufacturing of methamphetamine at Guam Reef Hotel*, DEA agents went to the hotel to investigate and found Love. After detaining and questioning Love, Love agreed to assist the DEA agents in the execution of a search warrant on Room 755. Love and the officers were at the lobby of the Guam Reef Hotel when the Defendants first entered. They were preparing to go up to the seventh floor to execute the search warrant on Room 755.

---

[11] Tayama also testified that she observed Love make a similar reaction to the one she made when she initially saw the Defendants in the lobby area.

After having observed Love's reaction upon seeing the Defendants in the lobby, the officials asked Love whether she knew the Defendants. Love replied that she did not. Love was then taken up to the seventh floor and she knocked on the door. The door was opened and the agents converged upon the room and secured the area within minutes. Individuals were found in Room 755.

Minutes after the execution of the warrant, the Defendant exited the elevator on the seventh floor. Tayama again observed a similar reaction from Love, and the Defendants were immediately confronted separately by the officials as they exited and were detained. Cruz-Taitano was taken to the right of the elevator past Room 755, and Guerrero was detained in front of elevator 2. Did the officers have particularized facts to reasonably suspect that the Defendants had engaged in criminal activity or were about to engage in criminal activity? More simply stated, did there exist articulated facts which would provide reasonable suspicion that the Defendants had engaged in the manufacturing of methamphetamine or were about to engage in such manufacturing?

As the Court has pointed out, Love denied knowing the Defendants. When this denial is weighed against Love's reactions as observed by Tayama and Duenas, it fails to provide reasonable suspicion. The Court notes that Love was cooperating with the officials at that point. Furthermore, the appearance of the Defendants on the seventh floor likewise provided no reasonable suspicion that the said individuals had engaged in, were engaging in, or were about to engage in the manufacture of methamphetamine. The officials could only detain the Defendants if there was reasonable suspicion the individuals were connected to the activities associated with Room 755 or with the manufacturing of methamphetamine at the Guam Reef Hotel. The combination of events (Love's reaction at the lobby area and similar reaction as the Defendants appeared on the seventh floor) possible could have provided some suspicion. The test, however, of a valid detention is not one of having some suspicion but whether there was *reasonable* suspicion. The officials had no facts suggesting that the Defendants were occupants of Room 755. The officers had no facts which showed the Defendants had any other connection to Room 755 or the manufacturing of methamphetamine at the Guam Reef Hotel. Moreover,

the Defendants were not in possession of any material, article or object which could be associated as an ingredient necessary or used in the methamphetamine manufacturing process.[12]

It has been suggested by law enforcement officials that the Defendants could have been there to purchase methamphetamine from Love or her companions and thus there was reasonable suspicion to detain in this regard. The Court must find and conclude such to be an unreasonable assumption and thus an unreasonable suspicion. The anonymous tip consisted solely of the information that four individuals were manufacturing methamphetamine at the Guam Reef Hotel. The anonymous tip did not state that the four individuals, in addition to manufacturing methamphetamine, were also engaged in the distribution or sale of the same. Thus, there could not exist any reasonable suspicion to believe the Defendants were there for the purpose of purchasing methamphetamine. Moreover, Love never mentioned to the officers that they were distributing or selling methamphetamine. The law enforcement's whole purpose at the Guam Reef Hotel was to investigate the tip that four individuals were involved in the manufacturing of methamphetamine.

The Court also notes that the Defendants were detained after the execution of the search warrant on Room 755. This is important because the anonymous tip mentioned only that four individuals were involved and connected to the methamphetamine manufacturing activities at the Guam Reef Hotel. The tip provided no information that others could have been involved in the manufacturing process. If others were so involved, such information could only have come from Love, who was then cooperating with law enforcement officials, but there was no such information. Once the warrant was executed, it would have been apparent to law enforcement officials that the Defendants had no connection to the activities in Room 755 because the number of individuals said to have been involved in the illegal manufacturing (four individuals

---

[12] The stop and detention of the Defendants here can be distinguished from the case involving Shardae Love where the Court found that officers had reasonable suspicion to detain her based on various factors, including the fact that at the time she was stopped, she had in her possession objects used in manufacturing methamphetamine. Furthermore, Love provided conflicting explanations about the use of the combustible fuel, which further arose police suspicions.

in total) had all been accounted for. There was no reason to suspect or detain any other individual. Love's similar reaction upon seeing the Defendants at the seventh floor could not have provided further suspicion of criminal activity on the part of the Defendants because the search warrant had already been executed. Her reactions upon seeing the Defendants at the lobby area or at the seventh floor can only be interpreted as one of embarrassment. How else can one reasonably explain such reaction upon seeing the Defendants after the execution of the warrant upon Room 755? Love was surrounded by law enforcement officers both in the lobby of the hotel and at the seventh floor. Anyone in Love's position would feel self-conscious as well, and would react similarly to avoid being recognized by others. It is unreasonable to associate Love's reactions with complicity on the part of the Defendants with the manufacturing of methamphetamine or to the activities associated in Room 755.

Therefore, for the reasons stated above, the Court finds that law enforcement officials had no reasonable suspicion to detain the Defendants as they exited the elevators on the seventh floor of the Guam Reef Hotel. The Court also finds that the Defendants were seized at that point in time by the said officials without probable cause. Thus, the Court finds and concludes that the Defendants' detention was illegal from the start.

The Court further finds that even if this initial detention gave rise to reasonable suspicion and was a legitimate investigative detention under Terry, the law enforcement officials exceed the bounds of a permissible Terry stop. A Terry stop must be *brief. Its scope and duration must be reasonable.* The investigation must be as *minimally intrusive* as possible, keeping in mind the circumstances that gave rise to the suspicion.

In this matter, the Defendants were separated from one another and then questioned. Once they were asked their names and they provided the same, they should have been released. Their names did not match the names of those mentioned in the anonymous tip as associated with the manufacturing of methamphetamine at the Guam Reef Hotel. The officials persisted in asking further questions. Additionally, the stop was not brief. Rather, it exceed the scope and duration of a reasonable detention, and it was not minimally intrusive. In this case, after the Defendants had identified themselves and explained their reason for being at the hotel, the

1. police continued to detain them without any legitimate justification for the extended seizure. The government's attempt to justify this continued detention on the basis of officer safety and concern for the Defendants' safety is without merit. If the police were truly concerned about their own safety while executing the search warrant and securing Room 755, then an officer should have been assigned to automatically stop any and all individuals from exiting the elevator on the seventh floor. Said individuals should have been immediately advised that there was a police investigation taking place and that no one was permitted to get off on the seventh floor. This was not done. Additionally, if the officers were sincerely concerned about the possibility of exposing the Defendants to the toxic fumes, then the Defendants and others should have been immediately removed from the vicinity of Room 755 and possibly the entire seventh floor. Again, this was not done. The police never even attempted to evacuate the innocent occupants of Room 754, which was just a few feet away from Room 755. The Defendants were told to wait for an indefinite period while the officers awaited further instructions from Cho. The Defendant's continued detention appears to have been based more on the officers' general uncertainty of what to do next as opposed to a concern for their safety or the safety of the Defendants. Furthermore, any concern for the Defendants' based on the toxic fumes from Room 755 or the potential for explosion were eliminated once the officers were advised that Room 755 had been secured. Because the officers lacked probable cause to detain the Defendants longer than was necessary, the Court finds that the Defendants' Fourth Amendment rights against unreasonable seizures were violated.

## CONCLUSION

Based on the foregoing, the Court hereby GRANTS the Defendants' motions to suppress. The Government is precluded from presenting in its case in chief against the Defendants all statements made by each of them and all articles seized from them, since these items represent the tainted products of the unlawful police action. Based on the record before

///

///

///

the Court, this evidence may form the only basis for the government's case against the Defendants. Accordingly, the Government is directed to advise the Court by April 6, 2006, whether it will continue to prosecute this case.

SO ORDERED this 29th day of March 2006.

JOAQUIN V.E. MANIBUSAN, JR.
United States Magistrate Judge